FILED
US DISTRICT COURT CLERK
WESTERN DIST. OF KY

04 DEC -3 AM 10: 26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION

\* \* \* \* \* \*

CELDONIA CRUZ, )
)
    Plaintiff, )
)
v. ) Civil Action No. 5:04CV-231-R
)
ELMER A. TOLIVER, )
831 Aspen Way )
Paducah, KY 42003 )
)
AND )
)
GENEVIE A. TOLIVER )
831 Aspen Way )
Paducah, KY 42003 )
)
    Defendants. )

## COMPLAINT

Plaintiff Celdonia Cruz, by counsel, states as follows for her Complaint against Defendants Dr. Elmer A. Toliver ("Dr. Toliver") and Genevie A. Toliver ("Ms. Toliver"), husband and wife (collectively, "Defendants").

### Nature Of The Action

1. This action arises from Defendants' virtual enslavement of Ms. Cruz, in violation of numerous statutes of the United States, including the Victims of Trafficking and Violence Protection Act of 2000. Through intimidation, confiscation of her passport, isolation from society, abuse of and threats of abuse of the legal process and other tools of coercion, Defendants held Ms. Cruz in a state of involuntary servitude for over three years. Finally able to escape, Ms. Cruz now brings this action for damages against Defendants.

**Jurisdiction And Venue**

2. Ms. Cruz is a citizen of the Republic of the Phillipines. She is currently present on a temporary basis in the United States.

3. Defendants are residents of McCracken County, Kentucky, which is within this Court's district. Accordingly, this Court has jurisdiction over the person of Defendants.

4. The claims asserted herein arise predominantly from numerous statutes of the United States of America, including the Victims of Trafficking and Violence Protection Act of 2000, 22 U.S.C. § 7101, *et seq*. Accordingly, the Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331. The Court also has pendent jurisdiction over the state law claims asserted herein.

5. Ms. Cruz has not been admitted to the United States for permanent residence. Therefore, this action is one between a citizen of a foreign state and citizens of the Commonwealth of Kentucky. Ms. Cruz seeks damages in excess of $75,000.00 exclusive of interest and costs. Therefore, this Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332.

6. The Defendants reside within the Court's district. A substantial part of the events or omissions giving rise to the claims asserted herein occurred within the Court's district. Accordingly, venue is appropriate in this Court pursuant to 28 U.S.C. § 1391.

**The Nature And Scope of the Crime
of Trafficking of Persons**

7. The Victims of Trafficking and Violence Protection Act of 2000, 22 U.S.C. § 7101, *et seq.* (the "Act"), was enacted effective October 28, 2000. The stated purposes of the Act included "combat[ting] trafficking in persons, a contemporary

manifestation of slavery whose victims are predominantly women and children." 22 U.S.C. § 7101(a).

    8.    The Act reflects the following findings, *inter alia*, of Congress:

- Approximately 50,000 women and children are trafficked into the United States each year.

- Trafficking in persons is a growing transnational crime that includes forced labor and involves significant violations of labor, public health, and human rights standards worldwide.

- Traffickers primarily target women and girls. They lure women and girls into their networks through false promises of decent working conditions at relatively good pay.

- Traffickers often transport victims from their home communities to unfamiliar destinations, including foreign countries away from family and friends, religious institutions and other sources of protection and support, leaving the victims defenseless and vulnerable.

- Force used against victims includes imprisonment, threats, psychological abuse and coercion.

- Involuntary servitude statues are intended to reach cases in which persons are held in a condition of servitude through nonviolent coercion.

- Because victims of trafficking are frequently unfamiliar with the laws, cultures and languages of the countries into which they have been trafficked, and because they are often subjected to coercion and intimidation, physical detention and debt bondage, these victims often find it difficult or impossible to report the crimes committed against them or to assist in the investigation and prosecution of such crimes.

- Trafficking of persons is an evil requiring concerted and rigorous action by countries of origin, transit or destination and by international organizations.

- The United States Declaration of Independence states that all men are created equal and that they are endowed by their Creator with certain unalienable rights. The right to be free from slavery and involuntary servitude is among those unalienable rights. Current

> practices of trafficking of women are similarly abhorrent to the principles upon which the United States was founded.

22 U.S.C. § 7101(b).

### Facts

9. Utilizing a network of individuals and organizations engaged in the international trafficking of persons, Defendants arranged to have Ms. Cruz flown from her home in the Philippines to Paducah for the purpose of becoming Defendants' domestic servant. By doing so, Defendants knowingly obtained a person for labor in violation of the Act. Upon information and belief, Defendants paid an agent of the network $8,000.00 in consideration of the network recruiting and transporting Ms. Cruz to the United States.

10. The trafficking network included "Enpang" (full name unknown), a recruiter living in the Philippines. Acting as the agent of Defendants, Enpang approached Ms. Cruz, asked her if she was willing to move to the United States to work for Defendants, and falsely promised Ms. Cruz that she would be paid $500 per month to be a domestic servant for Defendants and their two children. Enpang further said that he would, on behalf of the Defendants, provide the necessary airline ticket, and that if Ms. Cruz worked for the Defendants for three years, she would not owe any money for the airline ticket. Enpang further told Ms. Cruz that if she worked for Defendants for five years, Defendants would pay her an unspecified bonus and supply her with a return airline ticket to the Philippines.

11. Reasonably relying to her detriment upon these false promises, Ms. Cruz agreed to come to America. She traveled on a valid passport issued by the Republic of the Philippines and a tourist visa (good for one year). Using the airline ticket supplied by

Enpang and as instructed by him on behalf of Defendants, Ms. Cruz flew from Manila to Los Angeles, then to St. Louis, and then to Paducah, Kentucky, where she arrived on June 15, 2001. Ms. Toliver met Ms. Cruz at the Paducah airport and took her immediately to Defendants' home in Paducah. Defendants insisted that Ms. Cruz hand over her passport, which Defendants kept thereafter under lock and key.

12. Shortly after Ms. Cruz's arrival, Defendants informed Ms. Cruz that she would be paid $250 per month rather than the $500 she had been promised. She was also informed that Ms. Toliver was pregnant, and that Ms. Cruz would therefore soon be taking care of three children rather than two. Upon the arrival of the third child in February 2002 and at Ms. Cruz's request, Defendants agreed to increase her pay to $300 per month.

13. From the time of her arrival on June 15, 2001, until her escape in September, 2004, Ms. Cruz worked as a domestic servant for the Defendants. Her duties included, but were not limited to the following: cooking and serving meals for the entire family (usually three meals a day and often including different foods for each of the children); cleaning the Defendants' entire house; performing yard and gardening work at the Defendants' house; laundering clothes for the entire family; and bathing, cleaning up after and generally taking care of the Defendants' children, first numbering two and then three.

14. The Defendants caused and directed Ms. Cruz to perform the domestic duties described above for approximately 18 hours per day, seven days a week, 52 weeks per year. She was on call and thus effectively on duty 24 hours a day. Defendants routinely left town, leaving Ms. Cruz with sole responsibility for caring for the children

and the household.

15. Initially, the Defendants allowed Ms. Cruz to attend church services for a few hours on Sunday in the company of another Philippino domestic servant, a friend employed elsewhere in Paducah. The Defendants referred to this brief respite as Ms. Cruz's "time off." Later, the Defendants refused to let Ms. Cruz attend church in the company of her friend and instead insisted that she attend church with the Defendants, during which time she was expected to take care of the children. The Defendants continued to refer to these working visits to church as Ms. Cruz's "time off."

16. Defendants also routinely transported Ms. Cruz to Illinois and directed her to perform manual labor on farm property Defendants owned there.

17. During the entirety of her "employment" by the Defendants, Ms. Cruz was never allowed to receive her wages directly. Rather, Ms. Toliver would go to the Western Union in Paducah and wire money to Ms. Cruz's family in the Philippines. However, Ms. Toliver would routinely wire less money than the agreed upon wages, and would explain to Ms. Cruz that she had deducted money to cover "expenses" incurred as a result of Ms. Cruz's presence in Defendants' house.

18. Throughout Ms. Cruz's "employment," Defendants illegally coerced Ms. Cruz into remaining in the house as Defendants' servant. Defendants did so utilizing a variety of methods including but not limited to the following: keeping Ms. Cruz's passport locked in their bedroom and refusing to allow Ms. Cruz access to the passport; telling Ms. Cruz that if she left the house she would be arrested; threatening Ms. Cruz that if she ever left Defendants would accuse her of having stolen from them; telling Ms. Cruz that she was not allowed to leave until she had worked for them for five years, in

order to work off the $8,000.00 "credit" on her account (being the cost of procurement paid by Defendants to the trafficking network); limiting Ms. Cruz's contact with the outside world, including instructing her not to speak to any of Defendants' neighbors; and limiting Ms. Cruz's access to a telephone and monitoring all her telephone conversations.

19. In early 2004, Ms. Cruz's son died in the Philippines. She pleaded with Defendants to allow her to go to the Philippines to attend her son's funeral. Defendants refused, and told Ms. Cruz she was forbidden from going to the funeral.

20. In undertaking the conduct described herein, Defendants conspired with each other and with other members of their extended family residing in Chicago, Illinois.

21. Defendants' actions described herein constituted a scheme, plan or pattern intended to cause Ms. Cruz to believe that failure to remain in Defendants' "employment" would result in serious harm to or physical restraint against her.

22. Defendants' actions described herein constituted the abuse and threatened abuse of the legal process.

23. During the entirety of Ms. Cruz's "employment," Defendants failed to pay or withhold any Social Security or other taxes on Ms. Cruz's wages.

24. Ms. Cruz routinely worked well in excess of 100 hours per week. However, Defendants never paid her any overtime. Ms. Cruz's wages, even before the "deductions" unilaterally imposed by Defendants and not counting on-duty, non-working time, were approximately fifty cents (50¢) per hour, in gross violation of minimum wage requirements.

25. Defendants did not provide to Ms. Cruz written documentation of the number of hours she worked and the amount paid per hour, as required by the federal Fair

Labor Standards Act, 29 U.S.C. § 201, *et seq.*, and applicable Kentucky law including KRS 337.010, *et seq.*

26. Defendants failed to provide any benefits to Ms. Cruz, including without limitation any health insurance or health care.

27. Defendants' actions as set forth herein were intentional, willful and deliberate.

28. Defendants' conduct described herein was outrageous and intolerable, in that it offends against the generally accepted standard of decency and morality.

29. Defendants' conduct described herein caused and continues to cause Ms. Cruz severe emotional distress.

30. In September 2004, Ms. Cruz fled from Defendants' residence.

31. Upon information and belief, after Ms. Cruz escaped, Defendants sent Ms. Cruz's passport to the Consulate General of the Republic of the Philippines (located in Chicago), in a deliberate effort to create legal difficulty for Ms. Cruz in the event she were to attempt to leave the United States.

32. Upon information and belief, after Ms. Cruz escaped, Defendants procured the services of another Philipino immigrant, who is currently serving as the Defendants' domestic servant.

## Count I

33. Defendants' conduct constitutes Trafficking in Persons in violation of the Trafficking Victims Protection Act of 2000, 22 U.S.C. § 7101, *et seq.*, and further constitutes a Severe Form of Trafficking in Persons pursuant to 22 U.S.C. § 7102(8)(b), for which Ms. Cruz has a private right of action.

## Count II

34. Defendants' conduct constitutes Forced Labor in violation of 18 U.S.C. §1589, for which Ms. Cruz has a private right of action.

## Count III

35. Defendants' conduct constitutes Trafficking Into Servitude in violation of 18 U.S.C. §1590, for which Ms. Cruz has a private right of action.

## Count IV

36. Defendants' conduct constitutes Involuntary Servitude in violation of 18 U.S.C. §1584, for which Ms. Cruz has a private right of action.

## Count V

37. Defendants' conduct constitutes Peonage in violation of 18 U.S.C. §1581, for which Ms. Cruz has a private right of action.

## Count VI

38. Defendants' conduct constitutes Document Servitude in violation of 18 U.S.C. §1592, for which Ms. Cruz has a private right of action.

## Count VII

39. Defendants' conduct constitutes a Conspiracy Against Rights in violation of 18 U.S.C. §241, for which Ms. Cruz has a private right of action.

## Count VIII

40. Ms. Cruz is entitled to mandatory Restitution under 18 U.S.C. §1593.

## Count IX

41. Defendants' conduct constitutes a violation of the Thirteenth Amendment to the United States Constitution, for which Ms. Cruz has a private right of action

pursuant to 42 U.S.C. § 1985(3).

## Count X

42. Defendants' conduct constitutes a breach of their oral contract with Ms. Cruz.

## Count XI

43. Defendants' conduct constitutes conversion of Ms. Cruz's passport.

## Count XII

44. Defendants' conduct, including without limitation their failure to pay minimum wage, to pay overtime, and to account in writing for Ms. Cruz's hours and wages, constitutes willful violation of the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* and Kentucky law including KRS 337.010, *et seq.* Because Defendants' conduct was willful, Ms. Cruz is entitled to recover treble damages.

## Count XIII

45. Defendants' conduct constitutes the common law tort of outrage, and/or the intentional infliction of emotional distress.

## Count XIV

46. Defendants' conduct constitutes common law fraud, which conduct caused damages to Ms. Cruz.

## PRAYER FOR RELIEF

Accordingly, Plaintiff Celdonia Cruz respectfully demands the following relief:

1. an award of compensatory damages against Defendants, in an amount to be determined by the trier of fact but not less than $75,000.00, exclusive of interest and costs;

2. treble damages for Defendants' willful conduct in violation of the Fair Labor Standards Act;

3. punitive damages arising from the common law torts of outrage/intentional infliction of emotional distress, and fraud;

4. restitution pursuant to 18 U.S.C. §1593;

5. return of her passport;

6. attorney fees to the extent authorized by law;

7. her costs;

8. a jury trial on all issues so triable; and

9. any other relief to which she may be entitled.

Respectfully submitted,

DINSMORE AND SHOHL, LLP
Colin H. Lindsay

*/s/ Colin H. Lindsay*
500 West Jefferson Street
1400 PNC Plaza
Louisville, Kentucky 40202
(502) 540-2300
(502) 585-2207 (Facsimile)

95526v1
990-8311